## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL LEMAR** | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | **NO.  14-7102** |
| **CITY OF PHILADELPHIA, et al.** | : | |

### MEMORANDUM

**KEARNEY, J.**                                                                                   **JULY 20, 2015**

Imposing liability upon the City and Police Commissioner for an alleged unconstitutional stop, frisk and cavity search by police officers requires more than a rote conclusory allegation the City failed to properly train after knowing of problems with its stop-and-frisk policies based on claims and a consent decree in other cases not involving the same officers or plaintiff.  The aggrieved plaintiff must show disputed material facts showing a nexus between the alleged failure to train and the harm.  Here, following discovery and applying *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978) and its extensive progeny, Plaintiff shows no proof or genuine issue of material fact the City or Police Commissioner failed to train officers on reasonable suspicion to "stop" and on protocols for a cavity search.  Accordingly, we grant the City's and Commissioner's motion for summary judgment on all supervisory liability claims based entirely on alleged failure to train.

## I.    Facts[1]

Defendants Brian Waters and Daniel Rivera are officers with the Philadelphia Police Department. (Def.'s Statement of Material Fact ("Def.'s SOF"), ¶1.) Both officers received training on Police Directive #7 on the use of force including the force continuum and Directive #22 on body cavity searches while studying at the Police Academy. (ECF Doc. No. 16-3, p. 7, 12.)

On February 13, 2013 at approximately 11:30 A.M., Officers Waters and Rivera stopped Plaintiff Michael Lemar at 1300 W. Rush Street in Philadelphia. (Pl.'s Resp. to Def.'s "Stat. of Material Facts." ("Pl.'s Resp."), ¶2.) Parties dispute whether the officers had reasonable suspicion for the stop. Plaintiff claims the officers wrongly stopped him as he was "not engaging in suspicious behavior," and then proceeded to unlawfully search him. (Pl.'s Resp. ¶2-4.) The officers claim they stopped Plaintiff for involvement in a supposed drug transaction (ECF Doc. No. 16-3, p. 4, 10.) Plaintiff claims the two officers never told him why he was being stopped or searched. (Pl.'s Resp., ¶4.)

After the stop, Plaintiff describes being put in "overly tight handcuffs," being patted down, and having his clothes pulled down on the street by Officer Waters, who then performed a rectal cavity search. (*Id.*, ¶6.) Both officers deny performing such a cavity search. (ECF Doc. 16-3, p. 5, 10.) Officers Waters and Rivera both describe attempting to "frisk" Plaintiff as a search for "weapons and contraband," following a "furtive" movement to the waistband. (*Id.*) Before they could complete the frisk, the officers describe a crowd forming nearby. (*Id.*, 6, 10.) Officer Waters also cited Mr. Lemar's "uncooperative" behavior as a reason for taking him back to the 25th Police District Station to safely complete the search. (*Id.*, p. 4, 10.)

---

[1] There are several other disputed facts pertinent to Defendants Rivera, Waters, and John Does. Only facts required for the disposition of the current summary judgment motion brought by the City and Commissioner Ramsey are listed above.

Upon arrival at the 25th Police District Station, Plaintiff describes three other officers wearing latex gloves coming into the room and witnessing the initial part of the station search. (Pl.'s Resp. ¶4.) Officer Waters, however, does not remember other officers present during the search. (ECF Doc. No. 16-3, p. 6.) According to Plaintiff, once at the station, Officer Waters removed Plaintiff's clothes and performed a rectal cavity search. (Pl.'s Resp. ¶7.) Defendant Rivera allegedly participated cavity search at the station, before deferring to Officer Waters. (ECF Doc. No21-4, Pl.'s Dep., p. 90-91.) Mr. Lemar remembers the three witnessing officers exiting the room partway through the search. (*Id.*) Defendants did not find anything during the search.  The police never charged Mr. Lemar with a crime and released him from custody. (*Id.*, at p. 96.)

Plaintiff then sought medical attention at Temple University Hospital on February 20, 2013. (*Id.*, at p. 118.) Plaintiff complains of damage to the rectum, neck pain, scarring on the wrists, and pervasive psychological injuries. (ECF Doc. No. 7, Pl.'s Sec. Am. Compl., p. 8.) Plaintiff filed two Citizen's Complaints with the Police Department on March 21 and April 23, 2013. (ECF Doc. No. 17-4, p. 152-4.)

Plaintiff sued the City of Philadelphia, Commissioner Ramsey, Officers Waters, Rivera and Lipfor-Birch (for bystander liability) for violating his rights under the Fourth and Fourteenth Amendments.  After discovery, the City and Commissioner Charles Ramsey move for summary judgment on all claims against them. [2]

---

[2]     A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law…." *Id.* In ruling on a summary judgment motion, we consider "the facts and draw all reasonable inferences in the light most favorable to the plaintiff, the party who opposed summary

## II.    Analysis

Plaintiff claims the City and Commissioner Ramsey failed to adequately "train, supervise and/or investigate" its police officers to prevent Fourth Amendment violations,[3] and seeks a remedy under the Civil Rights Act, 42 U.S.C. § 1983.  To succeed, he must show "a violation of federal rights [was] a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 265 (3d Cir. 2010) (quoting *Bd. of Cnty. Comm'rs of Bryan County, Okla. v. Brown,* 520 U.S. 397, 404 (1997)).

At oral argument, Plaintiff's counsel confirmed his claim is based entirely on a "failure to train" theory as to the initial stop, excessive force and the cavity search. Under a failure to train theory, the Plaintiff must prove (1) deliberate indifference by a policy maker of the rights of persons whom they come in contact with <u>and</u> (2) the lack of training actually caused the constitutional violation. *Connick v. Thompson*, ___ U.S. ___, 131 S.Ct. 1350, 1360 (2011).

Plaintiff must first prove a propensity to violate Constitutional rights left unredressed through either 1) a "pattern of violations [that] puts municipal decisionmakers on notice that a

---

judgment." *Lamont v. New Jersey*, 637 F.3d 177, 179 n.1 (3d Cir. 2011) (citing *Scott v. Harris*, 550 U.S. 372 (2007)). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of (the record) which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 332. Sufficient evidence can be either direct or circumstantial, and "need not be as great a preponderance," but "the evidence must be more than a scintilla.'" *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007); see also *West v. Lincoln Benefit Life Co.*, 509 F.3d 160, 172 (3d Cir. 2007) ("Evidence that is merely colorable or not significantly probative is insufficient to create a genuine issue of material fact for trial.")

[3]      Specifically, unlawful searches and seizures and the use of excessive force.

4

new program is necessary" or 2) that "the need for new training is so obvious that failure to do so would constitute deliberate indifference" leading to a single incident of violation of a constitutional right. *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223 (3d Cir. 2014) (quoting *City of Canton v. Harris* 489 U.S. 378, 388-92 (1989)). Here, Plaintiff confirmed at oral argument the stop and excessive force is governed by the "pattern of violations" analysis and the cavity search is based on a "single incident" analysis.

In addition to showing propensity through either a pattern or single incident liability, Plaintiff bringing a failure-to-train *Monell* claim also must show a causal link between City's alleged failure to train and the harm. Instead of just "but for" causation, there must be a "close causal relationship between the identified deficiency and the ultimate injury." *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989) (internal quotations omitted).

Defendants City and Commissioner argue Plaintiff cannot muster a genuine issue of material fact to satisfy either the propensity or causation requirements of *Monell* failure-to-train liability. Relying heavily on *Canton*, Defendants argue that a failure-to-train §1983 claim must show "a need for more or different training or supervision is so obvious, and the inadequacy so likely to result in constitutional violations, that the failure to train or supervise can fairly be said to represent official policy." 489 U.S. 390; *see also, Stoneking v. Bradford Area School Dist.*, 882 F.2d 720, 724-26 (3d Cir.1989). Simply because an officer could have received "better" or "more" training does not state a §1983 claim under *Canton*. *Id.* at 391. Defendants' motion for summary judgment argues that a failure-to-train claim requires showing a conscious denial of necessary training, and some detail as to what sort of training might have prevented a constitutional violation. (ECF Doc. No. 16, Defs.' Mem. of Law in Supp. of Mot. to Dismiss, p.

5

8.) Further, Defendants argue that there is no evidence of acquiescence or widespread custom that led to the alleged Fourth Amendment violations in this case. *Id.*

The parties do not dispute the officers receive training while at the Police Academy on strip searches or use of force. Both Defendants and Plaintiff cite Appendix B of Directive No. 7 and Directive No. 22 of the Philadelphia Police Department, which detail appropriate procedures for a strip search, and general requirements for use of force. (Pl.'s Resp. ¶11-12, Def.'s SOF, ¶11-12.) The six detailed paragraphs of Appendix B of Directive No. 7 prohibit cavity searches except in limited circumstances, and the many procedures a police officer must undertake to initiate such a search.[4] Appendix B provides, with emphasis in original : POLICE PERSONNEL ARE NOT PERMITTED TO ROUTINELY CONDUCT OR AUTHORIZE STRIP/BODY CAVITY SEARCHES ON EVERY INDIVIDUAL TAKEN INTO POLICE CUSTODY. Plaintiff claims that "despite this policy, Defendants have failed to adequately train, supervise, and/or investigate with regard to searches and seizures and excessive use of force." (ECF Doc. No. 19-2, ¶12.)

### A. No evidence of a pattern of similar encounters notifying Defendants of stop-and-frisk violations.

Plaintiff argues the City and Commissioner's unlawful failure-to-train amounted to "deliberate indifference" to their officers' training on unlawful searches and seizures, and excessive use of force. In the failure-to-train context, the Supreme Court requires "[a] pattern of similar constitutional violations by untrained employees." *Connick,* 131 S.Ct. at 1350; *see also*

---

[4] The definition of an official policy: "often refers to formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480-81 (1986).

*Kelly v. Borough of Carlisle*, 622 F.3d 248, 265 (3d Cir. 2010). Failure-to-train liability rests squarely on the deliberate inaction of a municipality when its "policymakers were aware of, and acquiesced in, a pattern of constitutional violations." *Canton*, 489 U.S. at 397. Plaintiff pleads, and Defendants admit, the City and Commissioner Ramsey are policymakers. (ECF Doc. No. 12, Def.'s Ans. ¶ 24-25.)

Having shown a policymaker, Plaintiff bears the burden of showing his stop-and-frisk injury is sufficiently similar to a "pattern of violations" putting the City on notice of potential constitutional violations. *Canton*, 489 U.S. at 397. In *Connick*, for example, the Court found four previous constitutional violations by the district attorney's office inadequate to put them on notice because those violations did not arise from the same factual circumstances.[5] *Id.* at 1360; *see also Lawson v. City of Coatesville*, 42 F. Supp. 3d 664, 680 (E.D. Pa. 2014) (finding evidence of other false arrests insufficient to establish "similar constitutional violations" when the police made those arrests for dissimilar factual reasons). As such, Plaintiff must show a significantly similar set of circumstances that led to the alleged constitutional violation at issue here.

In January 2011, the City entered into a consent decree with a plaintiff class concerning its stop-and-frisk practices allegedly causing unconstitutional stops and searches of African American men without either reasonable suspicion or probable cause. (ECF Doc. No. 21-6, *Bailey v. City of Philadelphia*, Settlement Agreement, Class Certification, and Consent Decree,

---

[5] In *Connick*, "four prior *Brady* violations did not involve a 'failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind…[and] could not have put [the DA] on notice that the office's *Brady* training was inadequate with respect to th[at] sort of *Brady* violation." *Id.*

p. 1.)[6] As part of the consent decree, the City agreed to analyze its stop-and-frisk practices to "ensure future compliance with constitutional standards." (*Id.*) Although the City disputed the alleged unconstitutionality of its police practices, the consent decree included a reporting process whereby both sides analyzed the stop-and-frisk data and prepared reports. (*Id*, at p. 3-4.) Again, while the City differed with class plaintiffs' analysis, the data recovered may present a genuine issue of material fact as to whether the decree and its remedial efforts in 2013 put the City on notice of a pattern of stop-and-frisk encounters not supported by reasonable suspicion in cases involving African Americans and from the class period in similar stop-and-frisk encounters.

Here, Plaintiff admittedly cannot show an instance of similar stop-and-frisk encounters placing City on notice. Plaintiff's counsel admitted at oral argument he was not aware of any particular instance of any disciplinary conduct involving these officers. Plaintiff instead relies entirely on the *Bailey* consent decree with an allegation and resolution regarding unknown types of stops. It is unclear the types of stops involved in *Bailey*. Newspaper articles regarding other persons and possible stops and frisks do not meet the *Connick* standard. Absent any proof of similar stops and frisks placing the City and Commissioner on notice of a propensity, we cannot find a basis for liability on the "pattern of violations" theory to show propensity.

## B. Plaintiff cannot show a propensity for cavity searches based upon *Canton's* "single incident" standard.

Plaintiff seeks to impose §1983 liability upon the City and Commissioner for failing to train officers on proper procedures for cavity searches such as the two allegedly performed on Plaintiff. Plaintiff cites *Christopher v. Nestlerode* to support "a single constitutional violation can still provide the basis for municipal liability for failure to train." 240 F. App'x. 481, 489-90

---

[6] As discussed during oral argument, and not contested by any party, Plaintiff is not a member of this *Bailey* class.

(3d Cir. 2007). For example, if a city arms the officers with firearms, "the need to train officers in the constitutional limitations on the use of deadly force is so obvious that a failure to provide such training could provide a basis for single-incident municipal liability." *Thomas*, 749 F.3d at 223. Such liability depends on "likelihood that a situation will recur and the predictability that an officer lacking specific tools to handle the situation will violate citizens' rights." *Id.*

Whether the unconstitutional outcome is the "obvious consequence" from the City's level of training depends on where this case falls relative to the Supreme Court examples in *Canton* and *Connick*. At one end of the spectrum, the Court in *Canton* reviewed a city giving police officers weapons and then would "need to train officers in the constitutional limitations on the use of deadly force." *Thomas*, 749 F.3d at 223 (quoting *Canton,* 489 U.S. at 390 n. 10). At the other end, the Court in *Connick* held city prosecutors to be outside *Canton's* "narrow scope" because their "regime of legal training and professional responsibility" makes additional training by the City unnecessary. 131 S.Ct. at 1361. Determining the strength of a "single incident" theory of municipal liability, therefore, requires showing the probable outcome was within the "obvious consequence" scope of *Canton*.

Between the *Canton* and *Connick* goalposts, a Plaintiff can compile sufficient facts to show the complained-of injury was a "highly predictable consequence" of the failure to train. In *Thomas*, our Court of Appeals held evidence of a high frequency of fights in a highly volatile prison would allow a reasonable juror to conclude a predictable violation of Constitutional rights in a situation likely to recur. 749 F.3d at 225. Expert opinion evidence in *Thomas* showed a failure to provide "de-escalation and intervention training" may be "careless and dangerous" and also contributed to the court's denial of summary judgment. Other cases defeating summary

judgment show a state actor who "fail[ed] to provide protective measures and fail safes" to prevent mistakes in a frequently occurring situation. *Berg,* 219 F.3d at 277.[7]

Plaintiff's cavity search claim falls between *Canton* and *Connick* but does not share the characteristics of probability cited in *Thomas* and *Berg.* Unlike *Berg,* the City's directives provide "protective measures and fail safes" to prevent mistakes in a situation. 219 F.3d at 277. There is no present evidence of "frequent" cavity searches.  In *Berg,* there was no "double check" whereby the law enforcement officer issuing a warrant could be sure he or she was not issuing a warrant to the incorrect person. *Id.*  Police directive No. 7 §§ V-VII, on the other hand, contains a lengthy step-by-step process by which the requesting officer must approach the supervisor, obtain a warrant to show probable cause, and meet the medical facility requirements for such a search. (ECF Doc. No. 16-3, Exhibit E, pp. 41-46).[8] Similarly, in *Thomas,* the corrections officers had "*no* de-escalation or intervention training as a part of their pre-service training." *Thomas,* 749 F.3d at 225 (emphasis added). Here, Plaintiff admits both officers were trained on the directives—including those on cavity searches—in the Police Academy. (ECF Doc. No. 21, p. 6). Because the City instituted a system of safeguards to protect against unlawful cavity searches, and trained its officers in the system, their potential liability falls on the *Connick*

---

[7]In *Berg,* the record lacked evidence of procedures guarding against mistakenly issued warrants where the municipality "employed a design where the slip of a finger could result in wrongful arrest and imprisonment" *Id.* at 277; *see also Pelzer v. City of Philadelphia,* 656 F. Supp. 2d 517, 537 (E.D. Pa. 2009) (finding evidence of "significant internal disagreement as to what constitutes sound tactics, good judgment, and appropriate responses" that put the city on single-incident notice.)

[8] In *Noone v. City of Ocean City,* a summons form containing such safeguards as boxes for defendant's name, address, social security number, and date of birth allowed the City-Defendant to prevail at summary judgment dismissing a Fourth Amendment *Monell* claim. 60 F. App'x 904, 910 (3d Cir. 2003).

end of the spectrum. This case lacks the "obvious consequence" factors laid out in *Thomas* and *Berg* allowing a juror to conclude the officers' cavity search violation undoubtedly would occur.

### C. Plaintiff shows no causal link between an alleged failure to train and the harm.

Even assuming Plaintiff could adduce genuine issues of material fact on the officers' propensity to violate Fourth Amendment rights as a requisite to a failure to train *Monell* claim, the Plaintiff still has not adduced evidence of causation.   To show deliberate indifference, a Plaintiff must show not only a "pattern of violations," but also "a direct causal link between the municipal action and the deprivation of federal rights." *Board of Commissioners,* 520 U.S. at 404. The Third Circuit defines a sufficient causal link when "occurrence of the specific violation was made reasonably probable by permitted continuation of the custom." *Bielevicz,* 915 F.2d 845, 851 (3d Cir. 1990); *see also Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996) (requiring plaintiff to show that the constitutional harm was the "proximate cause" of *Monell* defendant's policy). Plaintiff bears the burden of advancing evidence connecting the deficient training program to this particular constitutional violation. *See, e.g. Martin v. Unknown U.S. Marshals*, 965 F. Supp. 2d 502, 546 (D.N.J. 2013) (granting summary judgment because none of the allegations tied "policies or customs" to the purportedly illegal seizure).

Plaintiff needs to show not only "continuation" of the current deficient training, but also a convincing nexus between that training and the present harm. Plaintiff's evidence of the *Bailey* consent decree, which he argues puts the City on notice of potential stop-and-frisk constitutional violations, does not go so far as to tie the alleged illegal search and seizure to these officers' training regime. Indeed, the re-evaluation of police practices in the stop-and-frisk context—

11

subject to the order in *Bailey*[9]— suggests the City is taking affirmative steps to change its training practices. To sustain a failure to train *Monell* claim, Plaintiff must adduce some connection between the training processes between January 2011 and February 2013 and the alleged constitutional violation in this case. As long as this element is absent, the claim must fail as a matter of law because Plaintiff has not raised a genuine issue of material fact of whether the training regime proximately caused the alleged harm.

Plaintiff did not adduce evidence of any failure to train caused any harm.   The directives address the stop-and-frisk, excessive force and cavity search protocols.   Plaintiff does not adduce evidence these officers failed to attend the Police Academy or the City failed to train officers on these specific directives.   Plaintiff does not adduce evidence these officers have any disciplinary history or any fact which could lead a jury to reasonably find the failure to repeatedly train caused the Plaintiff's harm.

### D.  No separate liability for Commissioner Ramsey.

After discovery, Plaintiff concedes he cannot show Commissioner Ramsey involved in any aspect of the stop-and-frisk and cavity search training given to Officers Waters. Rivera and Lipfor-Birch.   Plaintiff's argument against the Commissioner, similar to his broad claims of "notice" based on the *Bailey* consent decree, relies on general newspaper reports of investigations and the Commissioner's stated objectives of addressing police misconduct. Plaintiff's argument does not specify any connection to his harm. Plaintiff's claim against the Commissioner is based on the same claims he raises against the City under *Monell*.  Having found Plaintiff has not adduced genuine issues of material fact warranting a trial on claims

---

[9] "Where appropriate, new initiatives, regulations or other policy statements will be issued by the PPD, or ordered by the Court pursuant to Sections IV(E) and (F)." (ECF Doc. No. 21, p. 4.)

against the City, we similarly conclude there is no potential claim against Commissioner Ramsey.

Plaintiff cites *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.* as an example of the Third Circuit overturning summary judgment for supervisors after finding a sufficient issue of material fact as to causation. 372 F.3d 572, 582 (3d Cir. 2004). There, the juvenile facility did not train its child-care workers in conflict de-escalation despite a history of fights. *Id.*, at 581-2. Notably, both parties here agree the Police Department trains its employees in the Academy on Directive Nos. 7 and 22 dealing with use of force and body cavity searches. Further, there are no "specific acts or omissions" in this record that tie Commissioner Ramsey to the Plaintiff's harm. Absent a connection between the Commissioner and the allegedly deficient training program of these officers, the supervisory liability claim against Commissioner Ramsey cannot survive summary judgment.

## III.   Conclusion

Plaintiff adduced facts sufficient for the jury to determine whether Officers Waters, Rivera and Lipfor-Birch violated his Fourth Amendment rights.  After discovery, Plaintiff does not adduce facts creating a genuine issue as to the City or Commissioner Ramsey's liability under *Monell* for failure to train officers on stop-and-frisk policies similar to this situation or on cavity searches.  To the contrary, the only evidence of record is police directives on point and the officers learning of these directives while at the Police Academy.  There is no basis for requiring the City to provide periodic updates on policies unless it becomes aware of a propensity for its police force to violate Constitutional rights.  Here, Plaintiff cannot adduce any evidence the City and its Police Commissioner bear any supervisory liability for alleged conduct of Officers Waters, Rivera and Lipfor-Birch.